**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION**

| | |
|---|---|
| DYANTHANY PROUDIE, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Case No. 1:23-CV-00033-NCC |
| ) | |
| BILL STANGE, ) | |
| ) | |
| Respondent. ) | |

**<u>MEMORANDUM AND ORDER</u>**

This matter is before the Court on Petitioner's Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody.  (Doc. 1).  Respondent has filed a response (Doc. 16), and Petitioner has filed a reply (Doc. 25).  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Doc. 10).  After reviewing the case, the Court has determined that Petitioner is not entitled to relief.  As a result, the Court will **DENY** the Petition and **DISMISS** the case.

### I.    FACTUAL AND PROCEDURAL HISTORY

The Missouri Court of Appeals summarized the facts of Petitioner's case as follows:

In the incident underlying this post-conviction appeal, Ebony Jackson ("Victim") arrived at [Petitioner]'s apartment in St. Louis with her three-year old son on January 2, 2013. Before arriving, Victim had exchanged nine phone calls with [Petitioner], whom she had previously dated. [Petitioner] had invited Victim and her son to stay at his apartment along with [Petitioner]'s nephews, Williams and Gillespie. Williams was staying with [Petitioner] while on winter break from college and Gillespie was fourteen or fifteen years old at the time. Maurice Holtzclaw ("Holtzclaw") and his wife also resided in the apartment.

When Victim arrived at [Petitioner]'s apartment, she wanted to take a bath and began cleaning out the bathtub. Holtzclaw saw [Petitioner] walking towards the bathroom with a .38- caliber revolver in his hand. Williams saw [Petitioner] place the revolver on top of the refrigerator. [Petitioner] motioned for Williams, Gillespie, and Holtzclaw to go into the front room. Williams heard the bathroom

door close and then heard the sound of a single gunshot. [Petitioner] shot Victim behind the ear at close range, killing her.

[Petitioner] called Holtzclaw into the bathroom, where Holtzclaw saw Victim "lying on the floor bleeding, motionless" and a "lot of blood on the floor." [Petitioner] moved Victim's body in front of the refrigerator, just outside the bathroom door, and started to clean the bathroom. Williams saw the body outside the bathroom and noticed "blood everywhere." [Petitioner] told Holtzclaw and Williams he killed Victim because she had given him a sexually-transmitted disease ("STD"), which he had passed on to Girlfriend. [Petitioner] ordered his nephews and Holtzclaw to help clean up the murder scene. [Petitioner] remodeled the entire bathroom over several days, replacing the floors, changing the fixtures, and painting. [Petitioner] also directed Gillespie and Williams to scrub the basement floor after finding blood had seeped through the bathroom floor into the basement. [Petitioner] discarded furniture from the basement that had blood stains.

[Petitioner] directed Holtzclaw to help place Victim's body in the trunk of her car and drive it while [Petitioner] followed in his truck. [Petitioner] and Holtzclaw left Victim's car in a "derelict" neighborhood. Both men returned to [Petitioner]'s apartment. [Petitioner] then instructed Holtzclaw and his nephews to say nothing if questioned by police.

[Petitioner] abandoned Victim's son in a hallway of an apartment building approximately fifty feet from the apartment occupied by [Petitioner]'s estranged wife. Victim's son was found later and his father was contacted. The father told police that Victim had traveled to St. Louis several days earlier and that he had been unable to contact her.

The police investigated Victim's disappearance. Several days after her murder, police located her car using its GPS and discovered her body in the trunk. Police obtained Victim's cell phone records and found her phone was used within approximately one-tenth of a mile of [Petitioner]'s apartment for all communications between 8:00 p.m. and 10:41 p.m. on the night of her murder. Additionally, [Petitioner]'s phone number—matched to [Petitioner]'s address through Crime Matrix—was the only number Victim called before departing for St. Louis that did not belong to family or friends. Despite [Petitioner]'s remodeling of the bathroom, police recovered evidence of Victim's DNA from a swab taken from [Petitioner]'s bathroom vanity.

During the investigation, [Petitioner] and his family members took actions to intimidate both Holtzclaw and Williams. Holtzclaw had reached out to police and initially tried to protect [Petitioner]. Eventually Holtzclaw told police "the complete truth." After learning that Holtzclaw had spoken to police, [Petitioner] told Holtzclaw that it didn't matter what he said to the police as long as he didn't testify because Holtzclaw knows what happens "to people who testify." Detectives also interviewed Williams, who had returned to college in Arkansas and was

2

reluctant to speak with police. Williams's statements matched Holtzclaw's account of the murder. [Petitioner]'s family members went to Arkansas to get Williams and bring him back to St. Louis. Williams was told he was going to be prosecuted and needed a lawyer. When Williams arrived at his grandmother's house in St. Louis, he saw that his face had been cut out of all the family pictures.

(Resp. Ex. 13 at 2-4). [1]

On October 23, 2014, Petitioner was found guilty by a jury in Circuit Court of the City of Saint Louis, Missouri of one count of murder in the first degree and one associated count of armed criminal action. (Resp. Ex. 1 at 972). The Circuit Court sentenced Petitioner to life imprisonment without the possibility of probation or parole for the count of murder in the first degree, and to a term of thirty years imprisonment for the count of armed criminal action—with the sentences running concurrently. (*Id.* at 988). Petitioner appealed the judgment, raising three claims: (1) the trial court abused its discretion in excluding the testimony of Chad Jones as evidence of an alternative perpetrator because Petitioner established a direct connection between Holtzclaw and the murder through Holtzclaw's admissions during the trial, as well as his previous statements to Chad Jones implicating himself in Ebony Jackson's murder; (2) the trial court erred in excluding the testimony of Chad Jones on the basis of insufficient reliability, because Maurice Holtzclaw was an available declarant and his prior inconsistent statement should have been admitted through Chad Jones as substantive evidence to impeach Holtzclaw's credibility; and (3) the trial court clearly erred by overruling Petitioner's Batson objections to the State's peremptory strikes of venirepersons McKinnon and Primus as both strikes were pretextual and not race-neutral, and the State failed to strike similarly situated Caucasian

---

[1] This document, and others cited in this opinion, contains multiple sets of page numbers. The Court refers to the pagination in the lower right-hand corner. Additional facts relevant to Petitioner's specific claims will be set forth in the discussion section below.

3

venirepersons.  (Resp. Ex. 3 at 10-11).  On May 24, 2016, the Missouri Court of Appeals for the Eastern District affirmed the Circuit Court and issued its mandate (Resp. Ex. 6).

Petitioner filed his pro se motion for post-conviction relief on September 12, 2016, and filed an amended motion for post-conviction relief on July 12, 2017.  (Resp. Ex. 9 at 9, 39-70, 112-170).  The motion court conducted an evidentiary hearing on the amended motion on September 18 and September 25, 2018.  (Resp. Ex. 8).  On February 23, 2021, the motion court issued findings of fact and conclusions of law denying Petitioner's amended motion, and on March 25, 2021, Petitioner filed a notice of appeal.  (Resp. Ex. 9 at 228-344, 15).  As relevant here, Petitioner's appeal raised the following claims:

> The motion court erred in denying [Petitioner]'s Rule 29.15 motion for post-conviction relief after an evidentiary hearing because he proved by a preponderance of the evidence that he was denied his rights to due process of law and effective assistance of counsel as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 18(a) of the Missouri Constitution in that his trial attorneys were ineffective for failing to move to strike for cause or peremptorily, Mr. Anthony Blalock, who stated that he had personal feelings and information about the case because he used to work with two people who knew the victim and they talked about the victim being killed. Mr. Blalock told the court he would "try to stay impartial" and he did not know if he could listen to testimony about a person being killed. [Petitioner]'s trial attorneys did not move to strike Mr. Blalock for cause or peremptorily even though his statements suggested he could not be fair and impartial in deciding [Petitioner]'s case. But for his trial attorneys' ineffectiveness, there is a reasonable probability the outcome of [Petitioner]'s trial would have been different.
>
> …
>
> The motion court erred in denying [Petitioner]'s Rule 29.15 motion for post-conviction relief after an evidentiary hearing because he proved by a preponderance of the evidence that he was denied his rights to due process of law and effective assistance of counsel as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 18(a) of the Missouri Constitution in that his trial attorneys were ineffective for failing to impeach Mr. Ahmad Williams' trial testimony by presenting evidence through cross-examination of Mr. Williams and by calling Ms. JoAnn Matthews, Ms. JoDee Gillespie, and Ms. Love Proudie-Strickland as witnesses that Mr. Williams implicated [Petitioner] in the murder of Ebony Jackson because he wanted to collect

4

reward money offered to the individual who could provide information resulting in a conviction for Ms. Jackson's murder. Mr. Williams had a motive to fabricate what took place on January 2, 2013, because he aspired to receive reward money and he should have been cross-examined about it. Ms. Matthews, Ms. Gillespie, and Ms. Proudie-Strickland were willing and able to testify at [Petitioner]'s trial and could have been located through reasonable efforts. But for his trial attorneys' ineffectiveness, there is a reasonable probability the outcome of the trial would have been different.

…

The motion court erred in denying [Petitioner]'s Rule 29.15 motion for post-conviction relief after an evidentiary hearing because he proved by a preponderance of the evidence that he was denied his rights to due process of law and effective assistance of counsel as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 18(a) of the Missouri Constitution in that his trial attorneys were ineffective for failing to argue Mr. Chad Jones' testimony was admissible as substantive evidence under Section 491.074, RSMo as a prior inconsistent statement. [Petitioner] was prejudiced because had his trial attorneys argued Mr. Jones' testimony was admissible as substantive evidence under Section 491.074, the trial court was required to admit his testimony at trial. But for his trial attorneys' error, there is a reasonable probability the outcome of [Petitioner]'s trial would have been different.

(Resp. Ex. 11 at 25-30).  The Missouri Court of Appeals affirmed the motion court's judgment and issued its Mandate in Petitioner's post-conviction appeal on May 17, 2022.  (Resp. Exs. 13-14).

On March 9, 2023, Petitioner filed his Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody.  (Doc. 1).  He filed an Amended Petition on July 21, 2023.  (Doc. 15).  He raises the above three grounds from his appeal for state post-conviction relief, and adds a fourth:

Petitioner's convictions and sentences for the offenses of murder in the first degree and armed criminal action were secured in violation of Petitioner's constitutional right to due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution because the State presented perjured testimony that Petitioner threatened Maurice Holtzclaw and Ahmad Williams.  The State presented this evidence at trial, even though the state knew this testimony was false. Had the State not presented the perjured testimony, there is a reasonable probability that the outcome of Petitioner's trial would have been different.

(Doc. 15 at 27-28). Defendant has filed a response (Doc. 16) and Petitioner has filed a reply (Doc. 25).

## II.   DISCUSSION

### A.  Legal Standard for Reviewing Claims on the Merits

In the habeas setting, a federal court is bound by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254, to exercise only "limited and deferential review" of underlying state court decisions. *Lomholt v. Iowa*, 327 F.3d 748, 751 (8th Cir. 2003). Under this standard, a federal court may not grant relief to a state prisoner unless the state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "[A] determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner has the "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1).

A state court decision is "contrary to" clearly established Supreme Court precedents "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *see also Brown v. Payton*, 544 U.S. 133, 141 (2005). A state court decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams*, 529 U.S. at 407-08. Finally,

6

a state court decision involves an unreasonable determination of the facts in light of the evidence presented in the state court proceedings only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record.  28 U.S.C. § 2254(e)(1); *Ryan v. Clarke*, 387 F.3d 785, 790 (8th Cir. 2004).

### B.  Legal Standard for Procedurally Defaulted Claims

To preserve a claim for federal habeas review, "a state habeas petitioner must present that claim to the state court and allow that court an opportunity to address his claim." *Moore-El v. Luebbers*, 446 F.3d 890, 896 (8th Cir. 2006) (citing *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991)). "Where a petitioner fails to follow applicable state procedural rules, any claims not properly raised before the state court are procedurally defaulted." *Id.* The federal habeas court will consider a procedurally defaulted claim "only where the petitioner can establish either cause for the default and actual prejudice, or that the default will result in a fundamental miscarriage of justice." *Id.* (citing *Sawyer v. Whitley*, 505 U.S. 333, 338-39 (1992)).

### C.  Ineffective Assistance of Counsel Claims

In Grounds One, Two, and Three, Petitioner alleges that his trial counsel was ineffective. The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984).  To succeed on an ineffective assistance of counsel claim, Petitioner must show 1) that counsel failed to exercise the level of skill and diligence that a reasonably competent attorney would exercise in a similar situation, and 2) that Petitioner was prejudiced by counsel's failure.  *Strickland*, 466 U.S. at 687.  "Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Id.* at 690.  To prove prejudice, Petitioner must show there was a reasonable probability that, but for trial counsel's errors, the result of the

proceeding would have been different.  *Id.* at 694.  Federal habeas under AEDPA provides "doubly" deferential review of ineffective assistance claims which were decided in state court. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal citations omitted).

### i. Ground One: Failure to Argue the Admissibility of Jones' Testimony as Substantive Evidence

In Ground One, Plaintiff argues that trial counsel failed to argue that the testimony of witness Chad Jones was admissible as substantive evidence under § 491.074 RSMo of another testifying witness' prior inconsistent statement.  He asserts that trial counsel's choice to instead argue its admissibility as a statement against penal interest under *Chambers v. Mississippi*, 410 U.S. 284 (1973), constituted deficient performance and resulted in prejudice.

As relevant to this claim, the Court of Appeals summarized the facts as follows:

Prior to trial, [Petitioner] attempted to introduce hearsay testimony from Jones, an acquaintance of Holtzclaw's who was incarcerated with [Petitioner]. Holtzclaw testified he "probably" told Jones that when disposing of Victim's body, he drove Victim's car with her body in the trunk, but he denied telling Jones or anyone that he murdered Victim. [Petitioner] wanted Jones to testify because he believed Jones would say that Holtzclaw committed the murder and not [Petitioner]. [Petitioner] sought a late endorsement for Jones to testify, although one of his Trial Counsel, Kessler, found Jones not credible and believed Jones would perjure himself. [Petitioner] made an offer of proof in which Jones testified that he overheard Holtzclaw say he intended to rob Victim and "it went bad and [Holtzclaw] ended up shooting her." Jones further testified that Holtzclaw said he "took her body out of there and moved it." Following the offer of proof, the trial court permitted Jones's late endorsement but ultimately ruled that Jones's testimony was inadmissible under the authority offered. Specifically, [Petitioner] sought to introduce Jones's testimony through the hearsay exception involving statements against interest as set forth in *Chambers v. Mississippi*, 410 U.S. 288 (1973).

...

Holtzclaw also testified about his conversation with Jones about Victim's murder. Holtzclaw testified he "probably" told Jones that he drove the car with Victim's

8

body in the trunk to dispose of her body. However, Holtzclaw denied telling Jones that he, rather than [Petitioner], murdered Victim. Following the offer of proof, Trial Counsel argued before the trial court that Jones's testimony was admissible as a declaration against penal interest as in *Chambers*. The trial court ruled to exclude Jones's testimony, finding it did not satisfy the proffered hearsay exception.

(Resp. Ex. 13 at 4-5).

After noting the applicable standards, the Court of Appeals determined that Petitioner could not establish that there was a reasonable probability that the outcome of the trial would have been different had Jones's testimony been admitted.  First, the Court noted the "overwhelming evidence of [Petitioner]'s guilt":

The eyewitnesses gave identical accounts of how this crime occurred and who committed it: Victim went in the bathroom alone to take a bath, and [Petitioner] went in alone after her and shot her in the head because she had given him an STD. The eyewitnesses also both testified about [Petitioner's] threats to harm them if they snitched and his extensive efforts to remove and destroy evidence to conceal his crime. We cannot say that had the jury heard Jones's testimony, they would have reached a different result. Thus, even if Jones's testimony about Holtzclaw's prior inconsistent statement was admissible under Section 491.074, it was not reversible error to exclude it.

(Resp. Ex. 13 at 23) (quoting *State v. Proudie*, 493 S.W.3d 6, 13 (Mo. App. E.D. 2016)) (internal quotation marks omitted).  The state court also observed that, even absent Jones's testimony, the jury had plenty of reason to doubt Holtzclaw's credibility, as the record "comprehensively detailed Holtzclaw's involvement in the concealment and destruction of evidence following the murder, and how he evaded and lied to the police. The jury further heard Holtzclaw's own testimony that he had motives for testifying against [Petitioner]."  (*Id.* at 24).

Second, the Court of Appeals pointed to trial counsel's testimony at the evidentiary hearing that Jones' testimony did not seem credible and agreed that "Jones's testimony was otherwise uncorroborated and an outlier among the ample evidence of [Petitioner]'s guilt. Therefore, even under the clear-error standard, we cannot say that there exists any reasonable

9

probability that the outcome of the trial would have been different had Jones's testimony been admitted." (*Id.* at 24-25). Accordingly, the Missouri Court of Appeals affirmed the motion court's denial of Petitioner's claim because Petitioner failed to establish prejudice.

The Missouri Court of Appeals' rejection of this claim was not contrary to, or an unreasonable application of, *Strickland,* nor was it based on an unreasonable determination of the facts. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Such is particularly the case where, as here, the state court based its findings on evidentiary considerations regarding both evidentiary weight and admissibility. "Because the admission or exclusion of evidence is primarily a question of state law, an evidentiary determination rarely gives rise to a federal question reviewable in a habeas petition." *King v. Roper*, 2005 WL 1518291, at *15 (E.D. Mo. June 24, 2005) (citing *Scott v. Jones*, 915 F.2d 1188, 1190-91 (8th Cir. 1990)); *see also Parker v. Bowersox*, 94 F.3d 458, 460 (8th Cir. 1996) ("A state court's evidentiary rulings can form the basis for federal habeas relief under the due process clause only when they were so conspicuously prejudicial or of such magnitude as to fatally infect the trial and deprive the defendant of due process.").

Furthermore, the Court finds that the Court of Appeals' conclusions are supported by the record. Petitioner's trial counsel expressed his concerns with the trial court that Jones's testimony was not credible and would constitute perjury, due in part to the circumstances under which the proposed testimony came to trial counsel. (Resp. Ex. 1 at 13). Later, during the offer of proof, the trial court listed out the reasons that it did not find the statements sufficiently reliable:

> [T]he statements were not made spontaneously, were not made at or near the time of the incident, were not made to a close friend, were not made in confidence, were

10

not corroborated by any other evidence that's before the Court, and there's really a question whether or not the statement would exonerate the [Petitioner] if made, and if true, and the statements not only were denied by Mr. Holtzclaw, but they were actually at least twice repudiated by him by him saying not only did he not make those, but he would never make those statements.

(Resp. Ex. 1 at 870). Trial counsel cross-examined Holtzclaw not only on whether he told Jones that he killed the victim, but also on numerous other instances of him being dishonest to law enforcement, and on his active participation in covering up the killing. (*Id.* at 778, 782-86, 789-90, 793-94). Trial counsel presented to the jury multiple bases for questioning Holtzclaw's credibility and for suspecting him of being the actual perpetrator. Coupled with trial counsel's and the trial court's doubts about the reliability of Jones's testimony, the Court does not find the Court of Appeals' determinations to be unreasonable.

For the above reasons, the Court will deny relief under Ground One.

### ii.   Ground Two: Failure to Strike Venireperson Blalock

As a second ground for relief, Petitioner argues that trial counsel was deficient in failing to move to strike for cause, or alternatively using a peremptory strike on, juror Blalock. Petitioner asserts that Blalock's personal connections to the case, in addition to the personal feelings he expressed during voir dire about the crime and his responses regarding whether he could be fair and impartial, rendered Blalock a biased juror. Petitioner contends that he was prejudiced because Blalock served on his jury.

As relevant to this claim, the Court of Appeals summarized the facts as follows:

During voir dire, juror Blalock revealed that he had previously worked with two people who knew Victim. Blalock did not personally know Victim and assured the trial court that this information would not influence his decision-making or impartiality if selected for the jury. Blalock stated that the case was "disturbing to him" because a woman and a baby (Victim's young son) were involved, but "[t]hose facts alone will not cause" him "to be more bias[ed] against the defense[.]" When questioned further, Blalock responded that he would not "just shut down and stop listening" and that if he was chosen, he "would do it to the best of [his] ability."

11

…

> Trial Counsel testified at the evidentiary hearing about their strategy in choosing not to strike Blalock. In particular, Nicholas Williams explained that Blalock's answers could have been grounds for a peremptory strike, "if there were not six other people who were worse." Trial Counsel also concluded that a strike for cause would be denied, given Blalock's assurances of impartiality to the trial court.

(Resp. Ex. 13 at 5, 13).

The Court of Appeals determined that, while "some of Blalock's responses were not absolute," the record as a whole does not indicate bias or prejudice toward Petitioner and "the mere possibility of prejudice was not enough to disqualify Blalock." (*Id.* at 13). The state court noted, "As much as judges and lawyers might desire it, people generally do not speak in absolutes, probably because they realize that few things are ever absolute." (*Id.*) (quoting *Ogle v. State*, 807 S.W.2d 538, 542 (Mo. App. S.D. 1991)) (internal quotation marks omitted). Citing state law, it continued:

> The record is also clear that Trial Counsel stated their belief that a strike for cause would be denied and that there were other venirepersons meriting a peremptory strike over Blalock. Because Blalock was not unqualified as a juror supporting a motion to strike for cause and because Trial Counsel strategically chose to use their peremptory strikes against other jurors, Trial Counsel was not ineffective for failing to use a peremptory strike to remove Blalock.
> Absent evidence Blalock was biased against [Petitioner], we cannot hold that Trial Counsel were deficient for not striking Blalock, whether peremptorily or for cause.

(*Id*. at 14) (internal citations omitted).

The Missouri Court of Appeals' rejection of this claim was not contrary to, or an unreasonable application of, *Strickland*, nor was it based on an unreasonable determination of the facts. The state court had previously noted the applicable two-prong standard established in *Strickland* and, relying on state law, reasonably found Petitioner did not establish a *Strickland* claim because trial counsel's failure to strike Blalock as a juror was a reasonable strategic

12

decision.  (Resp. Ex. 13 at 12-14).  The state court's findings are also in accordance with federal law.  "To prevail on a claim of ineffective assistance of counsel based on the failure to strike a biased juror, a federal habeas petitioner must show that the juror was *actually biased* against the petitioner."  *Greenlee v. Wallace*, 2016 WL 4730312, at *9 (E.D. Mo. Sept. 12, 2016) (citing *Goeders v. Hundley*, 59 F.3d 73, 75 (8th Cir. 1995)) (emphasis added); *see also Williams v. Norris*, 612 F.3d 941, 954–55 (8th Cir. 2010) ("A demonstration of actual bias requires an impermissible affirmative statement; an 'equivocal' statement is insufficient.") (citing *Mack v. Caspari*, 92 F.3d 637, 642 (8th Cir. 1996)).  "Importantly, whether a juror is biased against the defendant is a question of fact, and a federal habeas court will defer to the state court's finding about juror bias if it is fairly supported by the record."  *McFarland v. Wallace*, 2015 WL 1347001, at *24 (E.D. Mo. Mar. 19, 2015) (citation modified).

The Missouri Court of Appeals' conclusion also has support in the record.  In response to questions during voir dire, venireperson Blalock expressed his belief that "everybody needs a fair trial," and said he would "try to stay impartial" and "do the best of my ability to either prove this person guilty or innocent" as a juror.  (Resp. Ex. 1 at 64).  Despite conveying that his life experiences made him dislike hearing about death, he affirmed that he would listen to testimony about a person's killing and would "[o]f course" be able to listen to evidence pertaining to an autopsy.  (*Id.* at 66).  He discounted the credibility or veracity of information he heard from coworkers, saying, "You know how things get blown up at work," and said that he found information from media like newspapers and television news to be "more truthful" than "what it would be on the street."  (*Id.* at 68).  Venireperson Blalock emphasized that, despite his coworkers having personal connections to Victim, "I would be just as fair, just as fair" as he would be on a jury in a different criminal case, "[b]ecause everybody deserves to be – either

way, guilty or [ ] innocent, depending on the other side of the coin." (*Id.* at 69).   Trial counsel Williams, who questioned Blalock during voir dire, later testified at the evidentiary hearing that "this process does not take place in a vacuum" and evaluation of jurors is context-dependent. (Resp. Ex. 8 at 91).  He explained that they were "looking for people who have a willingness to sit and listen to the evidence, to weigh the evidence as it comes in, to have an open mind, to give meaningful consideration to the defense, and not make a commitment prior to being sworn in as a jur[or]." (*Id.* at 94).  The Court agrees with the state court that Blalock did not demonstrate unequivocal bias, such that it was unreasonable that trial counsel chose to focus on other individuals for their strikes.

The Court reiterates that it is not the role of this Court to second-guess the state court's determination about a question of Missouri law.  *See Arnold v. Dormire*, 675 F.3d 1082, 1086 (8th Cir. 2012).  For this and all of the above reasons, Ground Two is denied.

### iii.     Ground Three: Failure to Impeach Mr. Williams' Testimony regarding Reward Money

In Ground Three, Petitioner argues that trial counsel was ineffective for failing to impeach Williams on the topic of reward money, either through cross-examination or by calling his mother, his sister, or his niece as witnesses.  Petitioner asserts that these three witnesses would have testified that Williams implicated Petitioner in the killing so that he could collect reward money in the case.

As relevant to this claim, the Court of Appeals summarized the testimony at the state evidentiary hearing on Petitioner's motion for post-conviction relief:

> Trial Counsel testified as to [Petitioner]'s claim that they failed to impeach Williams on the grounds that Williams had been motivated to testify against [Petitioner] by the offer of a monetary reward. [Trial Counsel] Hufty testified that Williams denied receiving any reward money at his deposition and that Trial Counsel would likely have pursued the reward-money theory if there had been

14

evidence to support it. [Trial Counsel] Nicholas Williams testified he believed the reward money was "not a credible motivation behind [the] accusation" and that the defense team decided "to maintain some credibility with the jury and did not go down that avenue." [Petitioner] called additional witnesses to testify about Williams and the reward money. [Petitioner]'s mother testified she learned from Facebook that Williams would receive reward money if he testified against [Petitioner]; however, Williams's post did not specifically refer to reward money. [Petitioner]'s sister testified that Williams told her that he was offered reward money in exchange for his testimony. [Petitioner]'s niece ("Niece") testified that Williams, Niece's brother, told her he was offered money to testify against [Petitioner].

(Resp. Ex. 13 at 8).

Relying on state law, the Missouri Court of Appeals determined that, in light of trial counsel's opinion that "the reward was not a credible motivation" behind Williams' testimony against Petitioner, it was reasonable trial strategy for trial counsel to decline pursuing that theory. (*Id.* at 21-22).  The state court observed that "the record lacks any evidence that the existence of an offer of a reward motivated Williams or that Williams received any reward money in exchange for his testimony against [Petitioner]" and that trial counsel was not deficient for attempting to "maintain some credibility with the jury" by choosing not to impeach a witness through testimony counsel believed was not credible.  (*Id.* at 22).

The Missouri Court of Appeals' rejection of this claim was not contrary to, or an unreasonable application of, *Strickland* and it was not based on an unreasonable determination of the facts.  The state court reasonably found Petitioner did not establish a *Strickland* claim because trial counsel's failure to pursue this line of impeachment was a reasonable strategic decision.  The Missouri Court of Appeals' conclusion is also consistent with federal law.  Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel.  *United States v. Orr*, 636 F.3d 944, 952 (8th Cir. 2011) (citation omitted); *see also Williams v. United States*, 452 F.3d 1009, 1013 (8th Cir.

15

2006) ("The court does not 'second-guess' trial strategy or rely on the benefit of hindsight and the attorney's conduct must fall below an objective standard of reasonableness to be found ineffective.") (internal citation omitted). "[W]e consistently have affirmed that a defense counsel's decision not to call a witness is a virtually unchallengeable decision of trial strategy." *Orr*, 636 F.3d at 955. Further, a failure to impeach constitutes ineffective assistance only when there is a reasonable probability, absent counsel's failure, the jury would have had reasonable doubt of the Petitioner's guilt. *Id*. at 952. Here, the Court cannot find that, but for trial counsel's alleged error, the outcome of Petitioner's trial would have been any different; Petitioner's trial counsel cross-examined Mr. Williams on multiple impeachable bases, including numerous instances of lying to law enforcement and his fear of prosecution—and losing his college scholarship—should he fail to cooperate. *Strickland*, 466 U.S. at 694 (noting that to establish prejudice, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."); *see also Armstrong v. Kemna,* 590 F.3d 592, 605 (8th Cir. 2010) ("[T]here is no prejudice [arising from trial counsel's failure to call a witness] if, factoring in the uncalled witnesses, the government's case remains overwhelming.").

The state court's factual findings also have support in the record. Trial counsel Hufty testified at the evidentiary hearing that, after hearing from the family that Williams was "just talking to get this reward money," he "searched high and low for some information that there was an award out there," and he never found evidence of any offer of, nor Williams' receipt of, reward money. (Resp. Ex. 8 at 36-39). He further noted that such money was "one more thing in an oodle of things that were already available to impeach Ahmad Williams," and that he believed trial counsel would have used such reward money to impeach Williams if they had

16

more concrete information about it—"but, you know, I didn't have any info on it," and he knew other trial counsel did not either.  (*Id.* at 42).  Other trial counsel also testified that credibility determinations informed the decision not to pursue the reward-money line of impeachment for Williams.  (*See, e.g.,* Resp. Ex. 8 at 111 ("it was clear that [the reward money] was not a credible motivation behind this accusation.  And in an effort at trial to maintain credibility with any potential juror, it did not present a strong motive in our defense"); *see also* Pet. Ex. 5 at 75-80).  Indeed, the Court notes that none of the proposed witnesses testified at the evidentiary hearing that they knew whether or not Williams had actually received any reward money.  (*See, e.g.,* Resp. Ex. 8 at 67 ("I don't know if he physically received the money")).

On cross-examination at trial, trial counsel engaged in a rigorous impeachment of Williams on other grounds.  For example, trial counsel cross-examined Williams about: detectives identifying him as a potential suspect in the killing; detectives threatening him with criminal charges if he did not cooperate; detectives threatening him that he would be unable to continue at college; his own involvement in cleaning up the crime scene; and multiple occasions on which he lied to law enforcement about his own and others' involvement in the killing. (Resp. Ex. 1 at 508-509; 520-537; 548-550).  Based on this record, the Court agrees with the state court that trial counsel presented other motivations for Williams' testimony that served to impeach his credibility to the jury, and that it was reasonable strategy for trial counsel to decline going down an additional avenue where counsel believed there was limited evidentiary support.

For the above reasons, the Court will deny relief on Ground Three.

**D.  Procedurally Defaulted Claim**

**i.   Ground Four: State's Presentation of Perjured Testimony**

17

In Ground Four, Petitioner argues that the State violated his due process rights under the Fourteenth Amendment by presenting perjured testimony regarding threats by, or on behalf, of Petitioner against Holtzclaw and Williams.  He points to the Assistant Circuit Attorney's statement to the trial court that "there were no threats made against witnesses or against the State." (Resp. Ex. 1 at 17).  He argues that, in light of this statement, testimony by Holtzclaw, Williams, and Detective Jerone Jackson regarding safety concerns—in addition to the State expressing, at sidebar to the trial court, caution regarding witnesses' safety—was perjury.

Petitioner failed to raise this claim in his direct appeal and post-conviction case, so it is procedurally defaulted.  *See Arnold*, 675 F.3d at 1087.  In his Traverse, Petitioner concedes the procedural default, but cites *Tokar v. Bowersox*, 198 F.3d 1039 (8th Cir. 1999), to excuse the default.  Specifically, Plaintiff cites to the comment in *Tokar* that "[i]neffective assistance of appellate counsel may constitute cause and prejudice excusing a procedural default."  198 F.3d at 1051.  However, the *Tokar* court clarified that "ineffectiveness of appellate counsel may not be asserted as cause to excuse a procedural default unless the petitioner has first presented this argument as an independent Sixth Amendment claim to the state courts, if a forum existed to make the argument."  *Id.* at 1051 n.13 (citing *Whitmill v. Armontrout,* 42 F.3d 1154, 1157 (8th Cir.1994)); *see Phillips v. Steele*, 2010 WL 4792043, at *4 (E.D. Mo. Nov. 18, 2010).

The Court acknowledges that Plaintiff included a claim akin to Ground Four—as an ineffective assistance of appellate counsel claim—in his *pro se* post-conviction relief motion; however, that claim did not make it into his amended petition and, accordingly, was not presented to the state courts. (*See, e.g.,* Resp. Ex. 9 at 58, 229; Resp. Ex. 11 at 24-29).  Nor does Plaintiff attempt to assert that his post-conviction counsel was ineffective for failing to include Ground Four in the amended petition for post-conviction relief.  Because Petitioner failed to

18

preserve these claims under Missouri law, the Court finds that Ground Four has been procedurally defaulted and Petitioner has not shown cause or prejudice.  Ground Four is denied.[2]

### III.    CONCLUSION

For the reasons stated above, the Court finds that Petitioner is not entitled to federal habeas relief.  Furthermore, Petitioner has failed to make a substantial showing of the denial of a constitutional right, which requires a demonstration "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Khaimov v. Crist*, 297 F.3d 783, 785 (8th Cir. 2002) (quotation omitted).  Thus, the Court will not issue a certificate of appealability.  28 U.S.C. § 2253(c).

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) is **DENIED** and this case is **DISMISSED**.

---

[2]    The Court also notes its skepticism that Petitioner has shown deficient performance by appellate counsel, so as to constitute cause for the procedural default. *See, e.g., Link v. Luebbers*, 469 F.3d 1197, 1205 (8th Cir. 2006) ("When appellate counsel competently asserts some claims on a defendant's behalf, it is difficult to sustain a[n] ineffective assistance claim based on allegations that counsel was deficient for failing to assert some other claims. Because one of appellate counsel's important duties is to focus on those arguments that are most likely to succeed, counsel will not be held to be ineffective for failure to raise every conceivable issue. Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.") (internal quotation marks omitted). *See also Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.") (citing *Jones v. Barnes*, 463 U.S. 745 (1983)). The Court finds nothing in the record to suggest that this claim was clearly stronger than those appellate counsel chose to present.

Further, the Court is skeptical that Ground Four would be a meritorious claim.  It is unclear that Petitioner actually points to a perjurious statement.  Specifically (and excluding the State's safety concerns as expressed at sidebar), the allegedly perjured testimony primarily involves Detective Jackson's observations of attempts by Petitioner's family to locate Holtzclaw, and Detective Jackson relaying such observations—and his fears that they were doing so "to possibly bring harm to him to prevent him from testifying"—to Holtzclaw. (Resp. Ex. 1 at 751, 825, 682). The Court doubts that this is any showing of perjury simply because the State told the trial court that there were no threats made against witnesses or the State.

19

**IT IS FURTHER ORDERED** that a certificate of appealability will not be issued.  28 U.S.C. § 2253.

A separate Judgment shall be entered in accordance with this Memorandum and Order.

Dated this 27th day of March, 2026.


    /s/ Noelle C. Collins
NOELLE C. COLLINS
UNITED STATES MAGISTRATE JUDGE